# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MATTHEW RICHARDS,                          :        CIVIL ACTION NO.
                                           :        3:02CV884 (DJS),
        PLAINTIFF,                         :

VS.                                        :

STATE OF CONNECTICUT DEPARTMENT OF         :
CORRECTIONS, and in their individual and official
capacities, WARDEN NELVIN A. LEVESTER,     :
LIEUTENANT MARK MURRAY, MAJOR PAUL
BRADMAN, CAPTAIN NELSON RODRIGUEZ,         :

        DEFENDANTS.                        :        SEPTEMBER 18, 2003

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO SUMMARY JUDGMENT

## I.    INTRODUCTION

Pursuant to Rule 56 of the of the Federal Rules of Civil Procedure, and Local Rule 9 (c), the plaintiff hereby opposes the defendant's motion for summary judgment. The defendants are not entitled to summary judgment as a matter of law because the plaintiff has been successful in presenting genuine issues to several material facts.

## II.   STATEMENT OF FACTS

### A.    THE EVENTS OF APRIL 5, 2002.

The plaintiff was hired by the Connecticut Department of Corrections in 1988 and was assigned to the Willard-Cybulski facility, specifically the Willard building, in 1992. On August 5, 2002, prior to roll call the plaintiff was at the Willard building, and was assigned to the Cybulski building. (9 (c) Statement ¶ 1.)  Murray is a Lieutenant with the Department of Corrections and

- 1 -

Corrections and was the supervisor of the plaintiff. (9 (c) Statement ¶ 2.)  Murry was the

plaintiff's supervisor on April 5, 2002. (9 (c) Statement ¶ 3.)

The plaintiff was informed that he was assigned to the Cybulski Building and was told by

Lieutenant Richards to use his personal vehicle to drive to the Cybulski Building.  According to

established unit policy, once employees report to his "scheduled" facility, any movement

between the buildings was to be by the transport officer and any use of a private vehicle was

prohibited.  It was against policy to drive a personal car between buildings.(9 (c) Statement ¶ 6.)

Prior to April 5, 2002 the unit policy was: Once a staff member reported to his "scheduled"

facility any movement between buildings was to be by the transport officer, use of private

vehicles was prohibited.  This policy was common knowledge to all staff.  (9 (c) Statement ¶ 7.)

The plaintiff waited for the facility transportation to pick him up and drive him to the Cybulski

Building.  All staff were not allowed to use personal vehicles between buildings and staff were

required to wait for a transport officer. (9 (c) Statement ¶ 9.)  On August 5, 2002, the plaintiff

was not late in reporting to Cybulski. (9 (c) Statement ¶ 10.)  When the plaintiff arrived at the

Cybulski building, Murry yelled at the plaintiff for being late and made the plaintiff write an

incident report for why he was late. (9 (c) Statement ¶ 11.)  Murry's actions toward the plaintiff

caused him to begin trembling and his illness was aggravated.  Murry ordered the plaintiff to

write an incident report although Murry knew the plaintiff was sick. (9 (c) Statement ¶ 13.)  The

plaintiff told Murry that he could not finish the report because he was feeling ill. (9 (c) Statement

¶ 14.)

The plaintiff contacted Murray again and told him that he needed medical attention.

Murray told the plaintiff that he would arrange for a ride to transport the plaintiff to the hospital

- 2 -

and the plaintiff was instructed to wait for the ride in the front of the building.  While the

plaintiff waited for the transportation, Murray approached the plaintiff and told him that he had

to report to Warden Levester before he was allowed to be medically treated.  Murry was ordered

by Bradnan to give the plaintiff a direct order to see the warden prior to receiving medical

treatment. (9 (c) Statement ¶ 18.)  The plaintiff was escorted by Captain Torres to the Levester's

office.  The plaintiff requested a union steward and medical attention before meeting with

Levester.  According to Article 13 of the State of Connecticut Corrections collective bargaining

agreement, an employee is entitled to have a union steward present when meeting with  the

Warden.  The plaintiff was denied union representation for his meeting with the Warden.  The

plaintiff was denied medical treatment for his illness and was forced to meet with Levester.  As

the plaintiff was being escorted to Levester's officer, the plaintiff became very ill and went to the

men's restroom and vomited.  "Warden Levester came out to the Lobby at this time and asked

where Richards was. (9 (c) Statement ¶ 25.)  Warden Levester was informed that Richards was

sick and he was in the mens' room. (9 (c) Statement ¶ 26.)  Defendant Bradnan was the

Administration Major at Cybulski-Willard and reported to Warden Levester. (9(c) Statement ¶

27.)  Bradnan was responsible for investigation inappropriate conduct and complaints.  (9 (c)

Statement ¶ 28.)  About two minutes later Major Bradnan came storming out of the

administrative area, throwing the door wide open and yelling, "Where is he?" (9 (c) Statement ¶

29.)  The plaintiff immediately told Bradnan that he was ill. (9 (c) Statement ¶ 30.)  Major

Bradnan then yelled "Lets's get him out here NOW!". (9 (c) Statement ¶ 31.)  The Major then

crosses the Lobby and started pounding, with his FIST, on the mens room door. (9 (c) Statement

¶ 32.)

While the plaintiff was vomiting in the bathroom, Major Bradman entered the hallway and demanded that the plaintiff come out of the bathroom. Bradman pounded on the bathroom door and yelled at the plaintiff: "Get your ass out here Richards". Bradman forced his way into the bathroom where the plaintiff was on his knees in front of the toilet vomiting, thus exposing the plaintiff to everyone in the hallway, and yelled at the plaintiff: "Get the fuck up and come with me . . . I don't give a fuck if you puke all over yourself, or all over the wall." (9 (c) Statement ¶ 34.) Major Bradnan was yelling at Richards through the door, telling/ordering Richards to get his ass out of the bathroom right now. (9 (c) Statement ¶ 35.) Richards responded with he was sick and would be out in a minute. (9 (c) Statement ¶ 36.) Bradnan then stood in the doorway with his hands on his hips, giving Richards direct orders to come out of the mens room. (9 (c) Statement ¶ 37.) Bradnan knew that the plaintiff was in emotional distress during the incident. (9 (c) Statement ¶ 38.) Levester saw the plaintiff on his knees in the bathroom as Bradnan and Levester yelled at the plaintiff. (9 (c) Statement ¶ 39.) Warden Levester referred to Richards, several times, as a "Big Baby" and then told Richards to leave the building and not to return until further notice.(9 (c) Statement ¶ 40.) The plaintiff was then taken to the hospital and treated. The plaintiff was very distressed after Murry ordered the plaintiff to write an incident report. (9 (c) Statement ¶ 42.) The plaintiff was very distressed after Bradnan ordered the plaintiff to report to Warden Levester. (9 (c) Statement ¶ 43.) Despite knowing that the plaintiff was ill and emotionally distressed, Bradnan took no action to obtain medical attention for the plaintiff. (9 (c) Statement ¶ 44.) Bradnan's conduct was inappropriate and is a violation of the code of conduct. (9 (c) Statement ¶ 45.) Using profanity toward a subordinate is violation of the DOC regulations and policies. (9 (c) Statement ¶ 46.) Levester's conduct was

inappropriate and is a violation of the code of conduct. (9 (c) Statement ¶ 47.)  Levester's June 6, 2002 memo was improper. (9 (c) Statement ¶ 48.)

**B.    ADVERSE ACTION AND RETALIATION**

The plaintiff was transferred following the incident. (9 (c) Statement ¶ 49.)  The plaintiff filed a complaint for workplace violence against Bradnan following the incident. (9 (c) Statement ¶ 50.)  It was improper for Levester to recommend a transfer of the plaintiff. (9 (c) Statement ¶ 51.)  The plaintiff was suspended and placed on administrative leave following the incident. (9 (c) Statement ¶ 52.)  The plaintiff was subject to an separate investigation initiated by the Levester following the formal investigation by CIU, which was improper. (9 (c) Statement ¶ 53.)  It was improper for Levester to investigate the plaintiff. (9 (c) Statement ¶ 54.)  The plaintiff was suspended and Bradnan did not receive any discipline. (9 (c) Statement ¶ 55.)  Bradnan should have received discipline for his actions against the plaintiff.(9 (c) Statement ¶ 56.)  The plaintiff made a complaint about feeling threatened by Bradnan and Bradnan and Levester conducted the investigation and the complaint was not referred to CIU. This was improper.(9 (c) Statement ¶ 57.)  Bradnan's conduct was in violation of the code and should have been disciplined but he was not disciplined.  (9 (c) Statement ¶ 58.)  Bradnan could have been transferred for his conduct but was not. (9 (c) Statement ¶ 59.)  The plaintiff was placed on administrative leave following the incident.  The plaintiff has been falsely accused by the defendants of being violent in the workplace, in that Bradnan did not report that the plaintiff had a pen (9 (c) Statement ¶ 61) and witnesses Klien, Torres and Levester did not see the plaintiff with a pen. (9 (c) Statement ¶ 61.)  Bradnan and Levester initiated a false action and investigation against the plaintiff alleging workplace violence in that, Bradnan made the allegation that the

plaintiff was threatening him with a pen although: (1) no one saw the plaintiff with a pen; (2)

Bradnan did not see the plaintiff with a pen; (3) no one saw the plaintiff threatening Bradnan; and

(4) Bradnan had protection from any alleged threats because he was surrounded by other officers,

the warden, and the control center. (9 (c) Statement ¶ 62.) Bradnan does not think the plaintiff

was holding a pen. (9 (c) Statement ¶ 64.) Levester reported that the plaintiff demonstrated

workplace violence although there was no violence or threats and the plaintiff did not have a pen

in his hand. (9 (c) Statement ¶ 65.) The plaintiff did not make any comments about harming

staff. (9 (c) Statement ¶ 66.) The plaintiff did not have a pen in his hand. (9 (c) Statement ¶ 67.)

No other officer had ever been summoned to the Warden's office for being late to a post, but

Warden Levester ordered Richards to appear to his office on April 5, 2002. (9 (c) Statement ¶

68.) The plaintiff was ordered to appear to the Department of Corrections Internal Affairs

Department for questioning regarding the incident. Prior to the incident of April 5, 2002, the

plaintiff had been targeted by Murray and falsely reprimanded. Prior to the incident of April 5,

2002, Murray yelled at the plaintiff and criticized him in front of other employees including

calling him stupid. The plaintiff filed a grievance against Lieutenant Hoffman for intentionally

making physical contact with the plaintiff's penis on March 31, 1997. The plaintiff had filed a

grievance against Murphy on 8/23/01. (9 (c) Statement ¶ 73.) The plaintiff filed a grievance

against Captain Rodriguez for intentionally making physical contact with the plaintiff's chest and

groin. Defendants Bradnan and Rodriguez had a good relationship and had worked with and for

each other in 2000. (9 (c) Statement ¶ 75.) Rodriguez targeted and retaliated against the plaintiff

for prior complaints made by the plaintiff. (9 (c) Statement ¶ 76.) The plaintiff filed complaints

and grievances against supervisors including Lt. Hoffman and Lt. Rodriguez regarding sexual

- 6 -

misconduct. (9 (c) Statement ¶ 77.) The plaintiff had made sexual complaints about

a supervisor of which he has been retaliated. (9 (c) Statement ¶ 78.) The plaintiff has been

falsely

reprimanded, criticized in front of other employees and humiliated by Murray and Rodriguez for

the complaints and grievances the plaintiff has filed. (9 (c) Statement ¶ 79.) Lieutenant Hoffman

and Rodriguez were not disciplined for their conduct against the plaintiff. (9 (c) Statement ¶ 80.)

The Plaintiff was disciplined with a written reprimand for the 4/5/02 incident. (9 (c) Statement ¶

81.) The plaintiff was denied access to his workplace after the April 5, 2002 incident. (9 (c)

Statement ¶ 82.) Following the 4/5/02 incident a policy on transportation was instituted. (9 (c)

Statement ¶ 83.)

## C.    INVESTIGATION AND INTERVIEWS

On April 10, 2002 Warden Nelvin Levester of Williard/Cybulski CI referred incident

report # 02-04-016 for review. The incident involved Correctional Officer Matthew Richards

allegedly using profanity, intimidating and unprofessional behavior towards Major Paul Bradnan

during the morning of April 5, 2002 at the Williard building in the public restroom. (9 (c)

Statement ¶ 84.) On April 10, 2002 C/O Richards was placed on Administrative Leave with pay

pending the outcome of the investigation. (9 (c) Statement ¶ 85.) On April 12, 2002 Director

James E. Huckabey authorized this investigator to conduct an Administrative Investigation

#CIU-02-04203 into the incident. (9 (c) Statement ¶ 86.) On April 15, 2002 Warden Nelvin

Levester received two letters form C/O Clint White, Chief Steward of AFSCME local 391

requesting that an investigation be conducted concerning the conduct of Major Bradnan during

Saavedra was a Captain for the Department of Corrections assigned to Central Intelligence Unit ("CIU"). (9 (c) Statement ¶ 89.) The investigation of Richards was assigned to Captain Mendelson. (9 (c) Statement ¶ 90.) The department recommended counseling for Levester and Bradnan which never happened (9 (c) Statement ¶ 91.) Neither Bradnan nor Levester were investigated for workplace violence or required to submit to a fit for duty exam. (9 (c) Statement ¶ 92.) Richards was interviewed by CIU about the incident on April 30, 2002. (9 (c) Statement ¶ 93.) Levester was not interviewed by CIU following the incident. (9 (c) Statement ¶ 94.) Bradnan was not counseled, investigated or disciplined by Levester or any supervisor following the incident. (9 (c) Statement ¶ 95.) Murray was not interviewed by CIU following the incident. (9 (c) Statement ¶ 96.) Eldridge was not interviewed by CIU following the incident. (9(c) Statement ¶ 97.) Klien was not interviewed by CIU following the incident. (9 (c) Statement ¶ 98.) The investigation by the CIU was not for violence in the workplace. (9 (c) Statement ¶ 99.) Captain MicKinney, the plaintiff's supervisor, and a witness to the incident was never questioned or interviewed by CIU. (9 (c) Statement ¶ 100.) Levester was promoted following the incident. (9 (c) Statement ¶ 101.)

### D.    THE DENIAL OF MEDICAL ATTENTION

To deny medical treatment is a violation of the DOC rules and regulations. (9 (c) Statement ¶ 102.) The plaintiff required medical attention following and during the incident. (9 (c) Statement ¶ 103.) Murry knew that the plaintiff was ill when he ordered the plaintiff to report to Warden Levester. (9 (c) Statement ¶ 104.) Murry had arranged CO Klien to accompany the plaintiff to the hospital prior to Bradnan's order. (9 (c) Statement ¶ 105.) If an inmate requests medical attention, the inmate must be seen immediately by a medical provider. (9 (c) Statement ¶

- 8 -

106.)  If a correction officer requests medical attention, the CO must be removed from their post and immediately provided with transportation to a medical provider. (9 (c) Statement ¶ 107.)

## III.    ARGUMENT

### A.    STANDARD FOR SUMMARY JUDGMENT

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202, 217 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact...." Miner v. Gen. Falls, 999 F.2d 655, 661 (2d Cir. 1993)(citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992).After discovery, if the nonmoving party "has failed to make sufficient showing on an essential element of his case with respect to which he has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, 273 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.) cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d. 117 (1991). See also, Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

In the context of a motion for summary judgment pursuant to Rule 56 (c), disputed issues

- 9 -

of fact are not material if the moving party would be entitled to judgment as a matter of law even if the disputed issues were resolved in favor of the nonmoving party. Such factual disputes, however genuine, are not material, and their presence will not preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also, Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir, 1992).

**B.    SUMMARY JUDGMENT STANDARD UNDER § 1983.**

To state a cause of action under §§ 1983, the plaintiff must show (1) that the defendants deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that they did so "under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); accord Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999); Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993). The elements of a plaintiff's case are the same under Section 1981, Section 1983, or Title VII. Direct evidence is not necessary to prove employer acted with discriminatory motive. Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995). A showing of pretext is evidence which allows a jury to infer discriminatory intent. Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995). Because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment state is sufficient to get the case to the jury. Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995). Procedural irregularities can provide sufficient evidence of pretext to defeat summary judgment where the disregarded procedures directly and uniquely disadvantage a minority employee, ..." Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995).

Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually inappropriate for summary judgment. Lac Du Flambeau Indians v. Stop Treaty

- 10 -

Abuse-Wis., 991 F.2d 1249 (7th Cir. 1993). Evidence of mixed motives is "ordinarily not the gist

for the summary judgment mill," and, where there was evidence that defendants were racists, ..."

Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis., 991 F.2d 1249 (7th Cir. 1993). Trier of fact

may consider the same evidence introduced to prove prima facie case in determining whether

discipline was pretextual.  Lowe v. City of Monrovia, 775 F.2d 998 (9th Cir. 1985) Decision as to

employer's motive is almost always for the trier of fact to determine at trial  Lowe v. City of

Monrovia, 775 F.2d 998 (9th Cir. 1985).

Plaintiff may defeat summary judgment in a discrimination or retaliation case if he or she

can present evidence that the proffered reason for the adverse action was pretextual or "unworthy

of belief" or if he or she can otherwise introduce evidence of illegal motive.  Bazisla v. Seagate

Technology, Inc., 145 F.3d 1159 (10th Cir. 1998). To survive summary judgment, a plaintiff will

prevail "by either a) discrediting the employer's proffered reasons, either circumstantially or

directly or b) by adducing evidence, whether circumstantial or direct, that discrimination was

more likely than not a motivating or determining cause of the adverse employment action." Torres

v. Casio Inc., 42 F.3d 825 (3rd Cir. 1994).

### C.    DISPUTES OF MATERIAL FACTS EXIST AS TO WHETHER THE DEFENDANTS RETALIATED AGAINST THE PLAINTIFF FOR HIS EXERCISE OF SPEECH.

To prevail on a First Amendment retaliation claim the plaintiff must establish: "(1) that

the speech or conduct at issue was protected, (2) that the defendant took adverse action against

the plaintiff, and (3) that there was a causal connection between the protected speech and the

adverse action." Garcia v. S.U.N.Y. Health Sciences Center, 280 F.3d 98 (2nd Cir. 2001); see

- 11 -

also <u>Dawes v. Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001).

The plaintiff's speech was constitutionally protected. <u>City of Houston v. Hill</u>, 482 U.S.

451, 461, 104 S. Ct. 2502 (1987) (First Amendment protects the right to criticize law

enforcement officials.) The plaintiff did file grievances against his supervisors. The plaintiff filed

a grievance against Lieutenant Hoffman for intentionally making physical contact with the

plaintiff's penis on March 31, 1997. (9 (c) Statement 72.) The plaintiff had filed a grievance

against Murphy on 8/23/01. (9 (c) Statement 73.) The plaintiff filed a grievance against Captain

Rodriguez for intentionally making physical contact with the plaintiff's chest and groin. (9 (c)

Statement 74, 77, 78.) The plaintiff filed a complaint for workplace violence against Bradnan

following the April 5, 2002 incident. (9 (c) Statement 59.) The plaintiff made a complaint about

feeling threatened by Bradnan and Levester conducted the investigation into the plaintiff's

complaint against Bradnan and the complaint was not referred to CIU. This was improper. (9 (c)

Statement 57.) Additionally, the plaintiff filed this federal lawsuit in May, 2002, which is

protected speech.

To establish that the defendant took adverse action against the plaintiff, the plaintiff must

show that defendants subjected him to "conduct that would deter a similarly situated individual of

ordinary firmness from exercising his or her constitutional rights." <u>Dawes</u>, supra, 239 at 493.

The plaintiff was subject to the following adverse action by Bradnan, Levester, and Murry.

The plaintiff was placed on administrative leave after filing a complaint of against Bradnan.

( 9 (c) Statement 60.)

Bradnan and Levester initiated a false action and investigation against the plaintiff alleging

- 12 -

workplace violence in that, Bradnan made the allegation that the plaintiff was threatening him with a pen although: (1) no one saw the plaintiff with a pen; (2) Bradnan did not see the plaintiff with a pen; (3) no one saw the plaintiff threatening Bradnan; and (4) Bradnan had protection from any alleged threats because he was surrounded by other officers, the warden, and the control center. (9 (c) Statements 60, 61, 63, 64, 65, 66.) The Plaintiff was disciplined with a written reprimand and was denied access to his workplace following his complaint against Bradnan. (9 (c) Statements 81, 82.) The plaintiff was subject to a separate investigation initiated by the Levester following the formal investigation by CIU, which was improper. (9 (c) Statements 53, 54.)

This conduct against the plaintiff would deter a similarly situated individual from filing complaints or grievances against a supervisor.

To establish a causal connection, the courts look to whether there is an inference that defendants had a retaliatory motive. Morales v. Mackalm, 278 F.3d 126 (2nd Cir. 2002). "The causal connection must be ... sufficient to warrant the inference that the speech played a substantial part' [in the adverse action]." Dawes, supra, 239 at 492, quoting Ezekwo v. NYC Health & Hosp. Corp., 940 F.2d 775, 780-91 (2d Cir. 1991).

Bradnan was motivated to retaliate against the plaintiff. The plaintiff filed a complaint for workplace violence against Bradnan following the incident. (9 (c) Statement 50.) Bradnan and Levester conducted the investigation into the plaintiff's complaint against Bradnan and the complaint was not referred to CIU. This was improper. (9 (c) Statement 57.) Defendants Bradnan and Rodriguez had a good relationship and had worked with and for each other, (9 (c) Statement 75.) Bradnan targeted and retaliated against the plaintiff for prior complaints made by

the plaintiff as well as the complaint made against Bradnan. (9 (c) Statement 76.)  Further,

Bradnan and Levester retaliated against the plaintiff in that they initiated a false action and

investigation against the plaintiff alleging workplace violence following the complaint made by the

plaintiff against Bradnan. (9 (c) Statements 60, 61, 63, 64, 65, 66.)  As the Administration Major,

Bradnan was responsible for investigation inappropriate conduct and complaints and reported to

Warden Levester. (9 (c) Statements 27, 28.)  The Plaintiff was disciplined with a written

reprimand and was denied access to his workplace following his complaint against Bradnan. (9 (c)

Statements 81, 82.) The plaintiff was subject to a separate investigation initiated by Levester

following the formal investigation by CIU, which was improper. (9 (c) Statements 53, 54.)

The plaintiff has demonstrated the causal connection and motivation behind the

defendants' Levester and Bradnan's actions.  Bradnan was the subject of the complaint and

improperly conducted the investigation into the plaintiff's complaint.  Levester and Bradnan

falsely accussed the plaintiff of violence.  This was in retaliation.

## D.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity provides that "government officials performing

discretionary function, generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." Soffit v. Brookfield, 950 F. 2d 880, 885 (2d Cir. 1991),

citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Government officials are protected from

liability "as long as their actions could reasonably have been thought consistent with the rights

they are alleged to have violated." Lee v. Sandberg, 136 F.3d 94, 101 (2d Cir. 1997) citing

Anderson v. Crieghton, 483 U.S. 635, 641 (1987).  The defense of qualified immunity depends on

- 14 -

whether "'a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information [he] possessed.'" Weyant v. Okst, 101 F.3d 845, 858 (2d Cir. 1996) citing Anderson, 483 U.S. at 641. Qualified immunity does not protect officials "who are plainly incompetent or those who knowingly violate the law." Id., citing Hunter v. Bryant, 502 U.S. 224, 229 (1991).

When qualified, good faith, immunity is evoked to protect a government official from liability for damages, on account of their performance of discretionary functions, their conduct can not have violated clearly established statutory or constitutional rights which a reasonable person would know of, Harlow v Fitzgerald, 457 U.S. 800, 818 (1982); La Bounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998), or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights. Anderson v. Creighton, 483 U.S. 635, 638 (1987). The availability of the defense turns on the reasonableness of the allegedly unlawful official action and whether the actions violate a clearly established statutory or constitutional right which a reasonable person would have known. Id.

## 1.    Rodriguez Is Not Entitled to Qualified Immunity.

The defendants argue that Rodriguez did not have personal involvement in the April 5, 2002 incident. However, Rodriguez was involved in prior complaint made by the plaintiff and had a relationship with Bradnan which creates an inference of Bradnan's motivation. The plaintiff filed a grievance against Captain Rodriguez for intentionally making physical contact with the plaintiff's chest and groin. (9 (c) Statement 74.) Defendants Bradnan and Rodriguez had a good relationship and had worked with and for each other in 2000. (9 (c) Statement 75.) Rodriguez

- 15 -

## **CERTIFICATION**

This is to certify that the foregoing has been sent, postage pre-paid, on September 18, 2003, to all counsel and pro se parties of record:

Tammy D. Geathers

Assistant Attorney General

55 Elm Street

P.O. Box 120

Hartford, CT 06141-0120

_____

15

targeted and retaliated against the plaintiff for prior complaints made by the plaintiff. (9 (c) Statement 76.) The plaintiff filed complaints and grievances against supervisors including Lt. Hoffman and Lt. Rodriguez regarding sexual misconduct.  (9 (c) Statement 77.) The plaintiff had made sexual complaints about a supervisor of which he has been retaliated.(9 (c) Statement 78.)

### 2.    Levester Is Not Entitled to Qualified Immunity.

The following facts demonstrate that Levester knew he violated the plaintiff's rights and that his actions were unreasonable.  The plaintiff requested a union steward and medical attention before meeting with Levester and Leveseter denied both union representation and medical attention to the plaintiff.  (9 (c) Statements 20, 21, 22, 23, 24.)  To deny medical treatment is a violation of the DOC rules and regulations and is improper    (9 (c) Statement   2, 106, 107.)

Levester knew that union representation was required. (9 (c) Statement 21.) Levester saw the plaintiff on his knees in the bathroom as Bradnan and Levester yelled at the plaintiff. (9 (c) Statement 39.) Warden Levester referred to Richards, several times, as a "Big Baby" and then told Richards to leave the building and not to return until further notice. (9 (c) Statement 40.)

Levester's conduct was inappropriate and is a violation of the code of conduct. (9 (c) Statements 47 48.) The plaintiff was subject to an separate investigation initiated by the Levester following the formal investigation by CIU, which was improper. (9 (c) Statement 53.)  It was improper for Levester to investigate the plaintiff. (9 (c) Statement 54.)  Levester knew his conduct violated the DOC rules regulations and policies as well as the plaintiff's rights.

- 16 -

### 3.    Murry Is Not Entitled to Qualified Immunity.

The following facts demonstrate that Murry knew he violated the plaintiff's rights and that his actions were unreasonable. When the plaintiff arrived at the Cybulski building, Murry yelled at the plaintiff for being late and made the plaintiff write an incident report for why he was late. (9 (c) Statement 11.) The plaintiff was very distressed after Murry ordered the plaintiff to write an incident report. (9 (c) Statement 42.) Murray's actions toward the plaintiff caused him to begin trembling and his illness was aggravated.(9 (c) Statement 12.) Murry ordered the plaintiff to write an incident report although Murry knew the plaintiff was sick.(9 (c) Statement 13.) The plaintiff told Murry that he could not finish the report because he was feeling ill. (9 (c) Statement 14.) The plaintiff contacted Murray again and told him that he needed medical attention.(9 (c) Statement 15.) Murry knew that the plaintiff was ill when he ordered the plaintiff to report to Warden Levester. (9 (c) Statement 104.) The denial of medical treatment violated the plaintiff's rights. Yelling and berating staff member is improper. Murry knew he was violating the plaintiff's rights.

### 4.    Bradnan Is Not Entitled to Qualified Immunity.

The following facts demonstrate that Bradnan knew he violated the plaintiff's rights and that his actions were unreasonable. Bradnan's conduct was improper and a violation of the code of conduct.(9 (c) Statements 45, 46.) It was improper for Bradnan to yell, swear, and expose the plaintiff to the public as the plaintiff was on his knees in front of the toilet. (9 (c) Statements 29-37.) As the Administration Major, Bradnan was responsible for investigation inappropriate conduct and complaints and reported to Warden Levester (9 (c) Statements 27, 28) and knew the

- 17 -

rules and regulations and proper investigatory procedures. Bradnan knew that the plaintiff was in

emotional distress during the incident. (9 (c) Statement 38.) The plaintiff was very distressed after

Bradnan ordered the plaintiff to report to Warden Levester. (9 (c) Statement 43.) Despite

knowing that the plaintiff was ill and emotionally distressed, Bradnan took no action to obtain

medical attention for the plaintiff. (9 (c) Statement 44.)

Further, Bradnan knew that it was a violation of the plaintiff's rights to retaliate against

him following the filing of the complaint against Bradnan. (9 (c) Statements 60, 61, 63, 64, 65,

66.) Bradnan knew his conduct violated the plaintiff's rights.

F.    **ISSUES OF MATERIAL FACT EXIST AS TO THE PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS.**

1.    **Substantive Due Process Claim.**

A claim for a substantive due process violation must "shock the conscience." Rochin v.

California, 342 U.S. 165, 172 (1952). "The Due Process Clause of the Fourteenth Amendment

was intended to prevent government 'from abusing [its] power, or employing it as an instrument

of oppression.'" De Shaney v. Winnebago County Dept. of Social Services, 489 U.S.189, 196

(1989) quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986. Actions violate the substantive

component of the Due Process Clause only when they "can properly be characterized as arbitrary,

or conscience shocking, in a constitutional sense." Collins v. Harker Heights, 503 U.S. 115, 128

(1992); see also County of Sacremento v. Lewis, 523 U.S. 833 (1998). Actions intended to

injure in some way and unjustifiable by any government interest will most likely be found

conscience-shocking. Id. This is a fact-specific inquiry that requires a case by case analysis.

- 18 -

Understanding that actions which would shock the conscience in one set of circumstances could be considered completely rational in another set of circumstances, the Supreme Court has established that the "deliberate indifference" standard will determine if an official's actions "shock the conscience." Sacremento v. Lewis, 523 U.S. at 850-1; see also Betts v. Brady, 316 U.S. 455, 462 (1942). Inherent to the word "deliberate" is the idea that the actor must contemplate her actions within a given time frame; split-second decisions that result in harm are not equal to those actions that are considered and implemented over a longer period of time. Pre-meditated actions are decidedly more egregious and therefore often rise to the level of constitutional violation. Id

The Supreme Court has held, and the Second Circuit has recognized, the subjective deliberate indifference standard to determine if an official's actions shock the conscience. This standard necessitates that the official actually knew of the substantial risks of his behavior and violated the individual's rights by responding with deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Hannahan v. City of Norwich, 959 F.Supp. 118, 122 (D. Conn. 1997). A government official shocks the conscience and violates one's substantive due process rights when, given the opportunity to deliberate and decide upon a course of action that would intentionally harm an individual, that official carries through with such actions. Daniels v. Williams, 474 U.S. 327,331, 106 S.Ct. 662 (1986). The actions of the defendants meet the criteria of subjective deliberate indifference.

The actions of the defendants clearly "shock the consciousness." Swearing and yelling at an individual at the work place while the individual in on his knees vomiting absolutely violates one's substantive due process rights. Bradnan and Levester's denial of medical treatment and denial of union representation further shock the consciousness. (9 (c) Statements 27-37, 45, 46,

- 19 -

58, 102.)  Further, retaliation against the plaintiff shocks the consciousness.

### 2.    Equal Protection Claim.

The plaintiff alleges an equal protection violation based upon selective enforcement. In order to establish an equal protection violation under the Fourteenth Amendment based upon selective enforcement, plaintiff must prove that (1) in comparison with others similarly situated, he was selectively treated, and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir.1999).

The plaintiff was treated differently than those similarly situated to him, specifically, Bradnan and Levester.  The department recommended counseling for Levester and Bradnan which never happened and neither were ever notified of the recommendation. (9 (c) Statement 91.)

Neither Bradnan nor Levester were investigated or interviewed for workplace violence or required to submit to a fit for duty exam. (9 (c) Statement 92.) Richards was interviewed by CIU about the incident on April 30, 2002. (9 (c) Statement 93.)

Bradnan was not counseled, investigated or disciplined by Levester or any supervisor following the incident. (9 (c) Statement 94.) Murray was not interviewed by CIU following the incident. (9 (c) Statement 95.) Witnesses to the incident were not interviewed.(9 (c) Statement 95, 96, 97, 98, 100.) Levester was promoted following the incident.(9(c) Statement 101.)  The plaintiff was interviewed, investigated, placed on administrative leave, required to submit to a fit for duty exam and was disciplined while Bradnan and Levester were not.  This demonstrates

- 20 -

disparate treatment against the plaintiff.

### 3.    Procedural Due Process Claim.

The Fourteenth Amendment guarantees an individual due process of the law where the state deprives an individual of a constitutionally protected liberty or property interest. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569, 33 L.Ed. 2d 548, 92 S. Ct. 2701 (1972). If no such interest is implicated, then no process is due the affected individual. See Id at 569-570. On the other hand, if the state deprives a person of a protected interest, the state must provide such procedures as the circumstances demand. <u>Mathews v. Eldridge</u>, 424 U.S. 319,333, 47 L. Ed.2d 18, 96 S. Ct. 893 (1976) (the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.") (quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552, 14 L.Ed.2d 62, 85 S. Ct 1187 (1965)). Property interests are created and defined " 'by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement of those benefits.'" <u>Id.</u> (citing <u>Donato v. Plainview- old Bethpage Cent. School Dist</u>, 96 F.3d at 629, quoting <u>Roth</u>, 408 U. S. At 577). "Plaintiff must establish that she has a 'constitutionally-protected 'legitimate claim of entitlement'" to the positions which she sought, rather than 'an unprotected unilateral expectation of employment' to have a protected property interest." <u>Id.</u> (citing <u>Donato</u>, 96 F.3d at 629)

The Second Circuit has indicated that, when applying the entitlement test, a court must look to "existing rules or misunderstandings that stem from an independent source such as state law" to determine whether a claimed property right rises to the level of a right entitled to protection..." <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 f.3d 124 (2d Cir. 1998) (quoting

Roth, 408 U.S. At 577).

The plaintiff was denied union representation and access to a union steward by Levester and Bradnan.

### G.    THE PLAINTIFF'S CLAIMS FOR MONEY DAMAGES ARE NOT BARRED BY THE ELEVENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

It is well settled that the "state's sovereign right not to be sued without its consent is not to be diminished by statute, unless a clear intention to that effect on the part of the legislature is disclosed, by use of express terms." Reynolds v. Connecticut Dept. of Public Utility Control, 2001 WL 1285588 (Conn.Super., Oct 11, 2001) (NO. CV010509064S). "[A] suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought . . . from the officer personally." Alden v. Maine, 527 U.S. 706, 757 (1999). Additionally, sovereign immunity "does not bar certain actions against state officers for injunctive or declaratory relief." Id.

The defendants argue that they are immune from suit under the Eleventh Amendment and to the extent that the plaintiff seeks monetary damages under § 1983, the claim should be dismissed. The defendants have been sued in their official and individual capacities. The plaintiff can maintain his § 1983 claim against the defendants for money damages in their individual capacity. Alden v. Maine, supra, 527 U.S. at 757. The plaintiff can also maintain his § 1983 claim against the defendants for injunctive relief in their official capacity.

- 22 -

**H.    THE COURT'S SHOULD ENTERTAIN THE PLAINTIFF'S STATE LAW CLAIMS IN THE INTEREST OF JUDICIAL ECONOMY.**

## <u>CONCLUSION</u>

Issues of material fact exist as to the plaintiff's First Amendment Retaliation, Fourteenth Amendment and state law claims. Therefore, the defendants' Motion for Summary Judgment should be denied.

PLAINTIFF,
MATTHEW RICHARDS

BY:_____
Erin O'Neil
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT 06119
(860)523-4055
Federal Bar #ct 23073

## **CERTIFICATION**

This is to certify that the foregoing has been sent, postage pre-paid, on September 19, 2003 to all counsel and pro se parties of record:

Tammy D. Geathers
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06111

_____
Erin I. O'Neil, Esq.