UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MATTHEW RICHARDS, : CIVIL ACTION NO.
: 3:02CV884 (DJS)
PLAINTIFF, :
:
VS. :
:
STATE OF CONNECTICUT DEPARTMENT OF :
CORRECTIONS, and in their individual and official :
capacities, WARDEN NELVIN A. LEVESTER, :
LIEUTENANT MARK MURRAY, MAJOR PAUL :
BRADMAN, CAPTAIN NELSON RODRIQUEZ, :
:
DEFENDANTS. : SEPTEMBER 18, 2003

**PLAINTIFF'S RESPONSE TO LOCAL RULE 9(c)(1) STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE**

The following are the Plaintiff's responses to the defendants facts not in dispute:

1.  Admit.

2.  Admit.

3.  Admit.

4.  Admit.

5.  Admit.

6.  Admit.

7.  Admit.

8.  Denied. On April 5, 2002 the plaintiff was assign to first shift and reported to Williard Building for roll call. (Plaintiff's affidavit, ¶ 3.)

9.  Admit.

28. Admit.

29. Deny. The plaintiff requested a Union Steward. (Plaintiff's affidavit, ¶ 20.)

30. Deny.

31. Deny.

32. Admit.

33. Admit.

34. Deny. The plaintiff was ill and on the bathroom floor when Bradnan forced open the bathroom door. (Plaintiff's affidavit, 9 (c) Statements ¶ 33-37.)

35. Deny.

36. Admit.

37. Deny.

38. Admit.

39. Deny.

40. Deny.

41. Deny.

42. Admit.

43. Admit.

44. Admit.

45. Deny.

46. Deny. The letter regarding his leave only states, "to allow an investigation into an incident in which you were involved."

47. Admit.

48. Admit.

49. Deny. The Plaintiff filed a grievance against Lieutenant Murry, and he submitted complaints against Captain Rodriguez, and Lieutenant Hoffman.

50. Deny. The Plaintiff has filed a grievance through c/o Chapdelaine, against Lieutenant Murry for calling the Plaintiff "stupid." ( 9 (c) Statements ¶ 72-75.)

51. Deny. The plaintiff was transferred to CCIE and charged with, "unprofessional conduct" for the April 5, 2002 incident.

52. Admit.

53. Deny. The Plaintiff was threatened by Major Bradnan. ( 9 (c) Statements ¶ 30-37 Plaintiff's affidavit, ¶ 33, 34.)

54. Deny.

55. Admit.

56. Admit.

57. Admit.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MATTHEW RICHARDS, : CIVIL ACTION NO.
: 3:02CV884 (DJS)
    PLAINTIFF, :
:
VS. :
:
STATE OF CONNECTICUT DEPARTMENT OF :
CORRECTIONS, and in their individual and official :
capacities, WARDEN NELVIN A. LEVESTER, :
LIEUTENANT MARK MURRAY, MAJOR PAUL :
BRADMAN, CAPTAIN NELSON RODRIQUEZ, :
:
    DEFENDANTS. :

## PLAINTIFF'S LOCAL RULE 9(c)(2) STATEMENT

**I.    THE EVENTS OF APRIL 5, 2002.**

1. On August 5, 2002, prior to roll call the plaintiff was at the Willard building, and was assigned to the Cybulski building. (Murry Deposition, p. 51.).

2. Murray is a Lieutenant with the Department of Corrections and was the supervisor of the plaintiff. (Murry Deposition, p. 7, 11.)

3. Murry was the plaintiff's supervisor on April 5, 2002. (Murry Deposition, p. 39.)

4. The plaintiff was informed that he was assigned to the Cybulski Building and was told by Lieutenant Richards to use his personal vehicle to drive to the Cybulski Building. (Plaintiff's affidavit, ¶ 4.)

5. According to established unit policy, once employees report to his "scheduled" facility, any movement between the buildings was to be by the transport officer and any use of a private vehicle was prohibited. (Plaintiff's affidavit, ¶ 5.)

6. It was against policy to drive a personal car between buildings. (McKinney Deposition, p.

46, 47.)

7. Prior to April 5, 2002 the unit policy was: Once a staff member reported to his "scheduled" facility any movement between buildings was to be by the transport officer, use of private vehicles was prohibited. This policy was common knowledge to all staff. (Exhibit E.)

8. The plaintiff waited for the facility transportation to pick him up and drive him to the Cybulski Building. (Plaintiff's affidavit, ¶ 6.)

9. All staff were not allowed to use personal vehicles between buildings and staff were required to wait for a transport officer. (Exhibit J)

10. On August 5, 2002, the plaintiff was not late in reporting to Cybulski. (McKinney Deposition, p. 49.)

11. When the plaintiff arrived at the Cybulski building, Murry yelled at the plaintiff for being late and made the plaintiff write an incident report for why he was late. (Murry Deposition, p. 54.)

12. Murray's actions toward the plaintiff caused him to begin trembling and his illness was aggravated. (Plaintiff's affidavit, ¶ 10, 11, 12.)

13. Murry ordered the plaintiff to write an incident report although Murry knew the plaintiff was sick. (McKinney Deposition, p. 54.)

14. The plaintiff told Murry that he could not finish the report because he was feeling ill. (Murry Deposition, p. 55.)

15. The plaintiff contacted Murray again and told him that he needed medical attention. (Plaintiff's affidavit, ¶ 12.)

16. Murray told the plaintiff that he would arrange for a ride to transport the plaintiff to the hospital and the plaintiff was instructed to wait for the ride in the front of the building. (Plaintiff's affidavit, ¶ 13.)

17. While the plaintiff waited for the transportation, Murray approached the plaintiff and told him that he had to report to Warden Levester before he was allowed to be medically treated. (Plaintiff's affidavit, ¶ 14, 15, 16, 17, 18, 19.)

18. Murry was ordered by Bradnan to give the plaintiff a direct order to see the warden prior to receiving medical treatment. (Murry Deposition, p. 56-59.)

19. The plaintiff was escorted by Captain Torres to the Levester's office. (Plaintiff's affidavit, ¶ 19, 20.)

20. The plaintiff requested a union steward and medical attention before meeting with Levester. (Plaintiff's affidavit, ¶ 20, 22.)

21. According to Article 13 of the State of Connecticut Corrections collective bargaining agreement, an employee is entitled to have a union steward present when meeting with the Warden. (Plaintiff's affidavit, ¶ 21.)

22. The plaintiff was denied union representation for his meeting with the Warden. (Plaintiff's affidavit, ¶ 22.)

23. The plaintiff was denied medical treatment for his illness and was forced to meet with Levester. (Plaintiff's affidavit, ¶ 23.)

24. As the plaintiff was being escorted to Levester's officer, the plaintiff became very ill and went to the men's restroom and vomited. (Plaintiff's affidavit, ¶ 24, 25, 28.)

25. Warden Levester came out to the Lobby at this time and asked where Richards was. (Exhibit E.)

26. Warden Levester was informed that Richards was sick and he was in the mensroom. (Exhibit E.)

27. Defendant Bradnan was the Adminstration Major at Cybulski- Willard and reported to Warden Levester. (Bradnan Deposition, p. 32.)

28. Bradnan was responsible for investigation inappropriate conduct and complaints. (Bradnan Deposition, p. 34.)

29. About two minutes later Major Bradnan came storming out of the administrative area, throwing the door wide open and yelling, "Where is he?" (Bradnan Deposition, p. 53; Exhibit E.)

30. The plaintiff immediately told Bradnan that he was ill. (Bradnan Deposition, p 50, 53, 54.)

31. Major Bradnan then yelled "Lets's get him out here NOW!". (Exhibit E.)

32. The Major then crosses the Lobby and started pounding, with his FIST, on the mens room door. (Exhibit E.)

33. While the plaintiff was vomiting in the bathroom, Major Bradman entered the hallway and demanded that the plaintiff come out of the bathroom. Bradman pounded on the bathroom door and yelled at the plaintiff: "Get your ass out here Richards". (Plaintiff's affidavit, ¶ 27.)

34. Bradman forced his way into the bathroom where the plaintiff was on his knees in front of the toilet vomiting, thus exposing the plaintiff to everyone in the hallway, and yelled at the plaintiff: "Get the fuck up and come with me . . . I don't give a fuck if you puke all over yourself, or all over the wall." (Exhibit E; Bradnan Deposition, p. 54.)

35. Major Bradnan was yelling at Richards through the door, ordering Richards to get his ass

out of the bathroom right now. (Exhibit E.)

36. Richards responded with he was sick and would be out in a minute. (Exhibit E.)

37. Bradnan then stood in the doorway with his hands on his hips, giving Richards direct orders to come out of the mens room. (Exhibit E.)

38. Bradnan knew that the plaintiff was in emotional distress during the incident. Bradnan Deposition, p. 62.)

39. Levester saw the plaintiff on his knees in the bathroom as Bradnan and Levester yelled at the plaintiff. (Deposition of Levester, p. 36, 46.)

40. Warden Levester referred to Richards, several times, as a "Big Baby" and then told Richards to leave the building and not to return until further notice. (Levester Deposition, p.40, 67; Exhibit E.)

41. The plaintiff was then taken to the hospital and treated. (Plaintiff's affidavit, ¶ 40.)

42. The plaintiff was very distressed after Murry ordered the plaintiff to write an incident report. (Murry Deposition, p. 60.)

43. The plaintiff was very distressed after Bradnan ordered the plaintiff to report to Warden Levester. (Murry Deposition, p. 60, 61.)

44. Despite knowing that the plaintiff was ill and emotionally distressed, Bradnan took no action to obtain medical attention for the plaintiff. (Bradnan, p 94.)

45. Bradnan's conduct was inappropriate and is a violation of the code of conduct. (Saavedra Deposition, p. 32-34; Murry Deposition, p. 99, 119, 120; Levester Deposition, p. 77.)

46. Using profanity toward a subordinate is violation of the DOC regulations and policies. (Rodriquez Deposition, p.11; Bradnan Deposition, p. 43, 47.)

47. Levester's conduct was inappropriate and is a violation of the code of conduct. (Saavedra

Deposition, p. 34, 35; Murry Deposition, p. 121, 122.)

48. Levester's June 6, 2002 memo was improper. (Saavedra Deposition, p. 36.)

## II. ADVERSE ACTION AND RETALIATION

49. The plaintiff was transferred following the incident. (Saavedra Deposition, p. 36; Murry Deposition, p. 25, 26.)

50. The plaintiff filed a complaint for workplace violence against Bradnan following the incident. (Levester Deposition, p. 92.)

51. It was improper for Levester to recommend a transfer of the plaintiff. (Saavedra Deposition, p. 36.)

52. The plaintiff was suspended and placed on administrative leave following the incident. (Saavedra Deposition, p. 42.)

53. The plaintiff was subject to an separate investigation initiated by the Levester following the formal investigation by CIU, which was improper. (Saavedra Deposition, p. 38-39.)

54. It was improper for Levester to investigate the plaintiff. (Saavedra Deposition, p. 39.)

55. The plaintiff was suspended and Bradnan did not receive any discipline. (Saavedra Deposition, p. 43.)

56. Bradnan should have received discipline for his actions against the plaintiff. (Saavedra Deposition, p. 43, 44.)

57. The plaintiff made a complaint about feeling threatened by Bradnan and Bradnan and Levester conducted the investigation and the complaint was not referred to CIU. This was improper.(Saavedra Deposition, p. 47.)

58. Bradnan's conduct was in violation of the code and should have been disciplined but he was not disciplined. (Levester Deposition, p. 79.)

59. Bradnan could have been transferred for his conduct but was not. (Levester Deposition, p. 79.)

60. The plaintiff was placed on administrative leave following the incident. (Plaintiff's affidavit, ¶ 41.)

61. The plaintiff has been falsely accused by the defendants of being violent in the workplace, in that Bradnan did not report that the plaintiff had a pen (Exhibit G.) and witnesses Klien, Torres and Levester did not see the plaintiff with a pen. (Exhibit H, D.)

62. Bradnan and Levester initiated a false action and investigation against the plaintiff alleging workplace violence in that, Bradnan made the allegation that the plaintiff was threatening him with a pen although: (1) no one saw the plaintiff with a pen; (2) Bradnan did not see the plaintiff with a pen; (3) no one saw the plaintiff threatening Bradnan; and (4) Bradnan had protection from any alleged threats because he was surrounded by other officers, the warden, and the control center. (Bradnan, p. 98, 99.)

63. Bradnan was not threatened by the plaintiff. (Plaintiff's affidavit, ¶ 34.)

64. Bradnan does not think the plaintiff was holding a pen. (Bradnan Deposition, p. 88, 90.)

65. Levester reported that the plaintiff demonstrated workplace violence although there was no violence or threats and the plaintiff did not have a pen in his hand. (Levester Deposition, 39; Exhibit D.)

66. The plaintiff did not make any comments about harming staff. (Saavedra Deposition, p. 45.)

67. The plaintiff did not have a pen in his hand. (McKinney Deposition, p. 39, 41.)

68. No other officer had ever been summoned to the Warden's office for being late to a post, but Warden Levester ordered Richards to appear to his office on April 5, 2002. (Bradnan

Deposition, p. 67.)

69. The plaintiff was ordered to appear to the Department of Corrections Internal Affairs Department for questioning regarding the incident. (Plaintiff's affidavit, ¶ 43.)

70. Prior to the incident of April 5, 2002, the plaintiff had been targeted by Murray and falsely reprimanded. (Plaintiff's affidavit, ¶ 44.)

71. Prior to the incident of April 5, 2002, Murray yelled at the plaintiff and criticized him in front of other employees including calling him stupid. (Plaintiff's affidavit, ¶ 45.)

72. The plaintiff filed a grievance against Lieutenant Hoffman for intentionally making physical contact with the plaintiff's penis on March 31, 1997. (Exhibit M.)

73. The plaintiff had filed a grievance against Murphy on 8/23/01. (Exhibit K.)

74. The plaintiff filed a grievance against Captain Rodriquez for intentionally making physical contact with the plaintiff's chest and groin. (Exhibit M.)

75. Defendants Bradnan and Rodriquez had a good relationship and had worked with and for each other in 2000. (Bradnan Deposition, pp. 28- 31.)

76. Rodriguez targeted and retaliated against the plaintiff for prior complaints made by the plaintiff. (Exhibit L.)

77. The plaintiff filed complaints and grievances against supervisors including Lt. Hoffman and Lt. Rodriguez regarding sexual misconduct. (Exhibit M.)

78. The plaintiff had made sexual complaints about a supervisor of which he has been retaliated. (Exhibit N.)

79. The plaintiff has been falsely reprimanded, criticized in front of other employees and humiliated by Murray and Rodriquez for the complaints and grievances the plaintiff has filed. (Exhibit M.)

80. Liuetenant Hoffman and Rodriquez were not disciplined for their conduct against the plaintiff.

81. The Plaintiff was disciplined with a written reprimand for the 4/5/02 incident. (Exhibit A.)

82. The plaintiff was denied access to his workplace after the April 5, 2002 incident. (Exhibit F.)

83. Following the 4/5/02 incident a policy on transportation was instituted. (Exhibit J.)

### III. INVESTIGATION AND INTERVIEWS

84. On April 10, 2002 Warden Nelvin Levester of Williard/Cybulski CI referred incident report # 02-04-016 for review. The incident involved Correctional Officer Matthew Richards allegedly using profanity, intimidating and unprofessional behavior towards Major Paul Bradnan during the morning of April 5, 2002 at the Williard building in the public restroom. (Exhibit O.)

85. On April 10, 2002 C/O Richards was placed on Administrative Leave with pay pending the outcome of the investigation. (Exhibit O.)

86. On April 12, 2002 Director James E. Huckabey authorized this investigator to conduct an Administrative Investigation #CIU-02-04203 into the incident. (Exhibit O.)

87. On April 15, 2002 Warden Nelvin Levester received two letters form C/O Clint White, Chief Steward of AFSCME local 391 requesting that an investigation be conducted concerning the conduct of Major Bradnan during the incident on April 5, 2002 in regards to Employee Conduct and Work Place Violence. (Exhibit O.)

88. On May 6, 2002 Mitch Drabik, Principal Personnel C/O forwarded a copy of an incident reporte submitted by C/O Paul Klein on April 16, 2002 that suggests unprofessional and

aggressive behavior by Major Bradnan during the incident on April 5, 2002. (Exhibit O.)

89. Alberto Saavedra was a Captain for the Department of Corrections assigned to Central Intelligence Unit ("CIU"). (Saavedra Deposition, p. 4, 5.)

90. The investigation of Richards was assigned to Captain Mendelson. (Saavedra Deposition, p. 6-9.)

91. The department recommended counseling for Levester and Bradnan which never happened (Exhibit B, C.)

92. Neither Bradnan nor Levester were investigated for workplace violence or required to submit to a fit for duty exam. (Levester Deposition, p. 93.)

93. Richards was interviewed by CIU about the incident on April 30, 2002. (Saavedra Deposition, p. 9.)

94. Levester was not interviewed by CIU following the incident. (Saavedra Deposition, p. 18, Levester Deposition, p 75.)

95. Bradnan was not counseled, investigated or disciplined by Levester or any supervisor following the incident. (Levester Deposition, p 40.)

96. Murray was not interviewed by CIU following the incident. (Saavedra Deposition, p. 19; Murry Deposition, p. 32.)

97. Eldridge was not interviewed by CIU following the incident.(Saavedra Deposition, p. 19.)

98. Klien was not interviewed by CIU following the incident. (Saavedra Deposition, p. 21.)

99. The investigation by the CIU was not for violence in the workplace. (Saavedra Deposition, p. 45.)

100. Captain MicKinney, the plaintiff's supervisor, and a witness to the incident was never questioned or interviewed by CIU. (McKinney Deposition, p. 65.)

101. Levester was promoted following the incident. (Levester Deposition, p. 81-82.)

### IV. THE DENIAL OF MEDICAL ATTENTION

102. To deny medical treatment is a violation of the DOC rules and regulations. (Saavedra Deposition, p. 32.)

103. The plaintiff required medical attention following and during the incident. (Exhibit I.)

104. Murry knew that the plaintiff was ill when he ordered the plaintiff to report to Warden Levester. (Murry Deposition, p. 61.)

105. Murry had arranged CO Klien to accompany the plaintiff to the hospital prior to Bradnan's order. (Murry Deposition, p. 63, 64.)

106. If an inmate requests medical attention, the inmate must be seen immediately by a medical provider. (Murry Deposition, p. 41, 42.)

107. If a correction officer requests medical attention, the CO must be removed from their post and immediately provided with transportation to a medical provider. (Murry Deposition, p. 42-44., Levester deposition, p. 71.)

PLAINTIFF,
MATTHEW RICHARDS

BY: /s/

Erin I. O'Neil, Esq.
Brewer & O'Neil, LLC
818 Farmington Avenue
West Hartford, CT 06119
(860) 523-4055
Federal Bar # ct 23073
His Attorney

**CERTIFICATION**

This is to certify that the foregoing has been sent, postage pre-paid, on September 18, 2003, to all counsel and pro se parties of record:

Tammy D. Geathers
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Erin I. O'Neil