# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MATTHEW RICHARDS,                           :
     Plaintiff,                            :
                                 :

v.                                          :
                                 :    No. 3:02CV884 (DJS)

STATE OF CONNECTICUT                        :
DEPARTMENT OF CORRECTIONS,                  :
and in their individual and official        :
capacities, WARDEN NELVIN A.                :
LEVESTER, LIEUTENANT MARK                   :
MURRAY, MAJOR PAUL BRADNAN,                 :
CAPTAIN NELSON RODRIGUEZ,                   :
     Defendants.                           :

## MEMORANDUM OF DECISION

Defendants State of Connecticut Department of Corrections, Nelvin A. Levester, Mark Murry, Paul Bradnan and Nelson Rodriguez move this court for summary judgment in their favor as to all counts of the plaintiff's complaint. Matthew Richards seeks damages against all defendants for alleged retaliation against him in violation of his First Amendment right to freedom of speech and also for the alleged denial of substantive and procedural due process guaranteed by the Fourteenth Amendment. For the following reasons, the motion for summary judgment **[doc. #34]** is **GRANTED**.

## Facts

Plaintiff, Matthew Richards ("Richards"), was hired as a correctional officer by the Connecticut Department of Corrections ("DOC") in 1988 and assigned to the Osborne Correctional Institute, formerly the Somers Correctional Institute. Richards moved to the Willard-Cybulski Correctional Institute ("Willard-Cybulski") in 1992, and was employed at that

-1-

facility during the course of the events described herein. Willard-Cybulski consists of two separate buildings that are treated, for administrative purposes, as a single facility. The Willard building is located in Enfield, Connecticut and the Cybulski building is located in Somers, Connecticut; the two facilities are approximately one mile apart. Plaintiff was generally posted in the Willard building during his employment at Willard-Cybulski. On April 5, 2002, the date of the events giving rise to this action, Richards was posted to the Cybulski building, although he did not realize this and instead arrived, as usual, for the first shift at the Willard building. The first shift began at 7:00 am and ended at 3:00 pm. Richards arrived, on time, for roll call prior to his shift at 6:45 am.

Richards was informed at roll call that he had been assigned, for that day, to the Cybulski building. Plaintiff waited for transportation, provided by the Department of Corrections, to arrive and ferry him from the Willard building to the Cybulski building. According to Richards there was a policy in place that prohibited employees from driving their own vehicles from one building to the other buildings at the site. Plaintiff contends that the policy was reiterated verbally each morning at roll call. A dispute exists regarding the existence, prior to April 5, 2002, of a written policy governing the use of personal vehicles to travel between buildings at Willard-Cybulski. Richards did not use his personal vehicle and, as a result, did not arrive at the Cybulski building until 7:30 am, a time that was 30 minutes after the scheduled start of his shift.

Richards arrived at his post and shortly after was contacted via phone by Lieutenant Mark Murry ("Murry"), his supervisor. Murry testified that he called to ascertain whether Richards had arrived at his post. According to Murry, Richards's post was covered by another officer for the 30 minutes that Richards was absent. Murry testified that he instructed Richards to fill out an

incident report explaining why he was late because Murry needed documentation to justify his decision to use another corrections officer to cover Richards's post from 7 to 7:30 am. Richards testified that Murry confronted him and yelled at him for arriving late, although a witness to Murry's actions, Captain Joyce McKinney ("McKinney") does not recall Murry yelling at Richards.

Murry states that Richards called him a few minutes after arriving and told him that he, Richards, was too sick to work and too sick to fill out the incident report. Murry asked Richards if he needed relief and told Richards that he would get relief, i.e., another officer to cover his post for the day. Richards was instructed to leave his post when relief arrived and wait for transportation to a nearby hospital for treatment.

McKinney testified that she was present during the conversation between Richards and Murry. According to McKinney, whenever relief is requested for a corrections officer, the lieutenant or other on-site supervisor must report the request up the chain of command. Either Murry or McKinney was required to contact Major Paul Bradnan ("Bradnan"), their immediate superior. McKinney testified that Murry agreed to call Bradnan. Murry states that Bradnan was not present, so he left a message. Bradnan returned Murry's call and told the lieutenant that Richards was ordered to report to the Willard building for a meeting with Warden Nelvin Levester ("Levester") prior to receiving medical treatment.

Richards contends that Murray's conduct aggravated an unspecified illness that he began experiencing prior to his arrival at work.  Plaintiff testified that he felt too sick to complete the incident report. Richards informed Murray that he was sick and required medical attention and also that he was too ill to complete the incident report. Murry then told Richards that he would

arrange for transport to the hospital and instructed Richards to wait for transport in front of the Cybulski building. Murry had originally assigned corrections officer Paul Klein ("Klein") as an escort for Richards and instructed Klein to take Richards to the hospital and stay with him. Murry altered his orders after speaking with Bradnan. Klein was instructed to take Richards to the Willard building prior to escorting him to the hospital.

Klein took Richards to Willard, where they were met by Captain Geraldo Torres ("Torres"). Richards informed Torres that he wanted a union steward present during his meeting with the warden as permitted by the collective bargaining agreement governing his employment. Richards testified that he felt very sick–dizzy, light-headed and nauseated–went to the nearest bathroom, in the public lobby of the Willard building, locked the door to the bathroom and vomited into a toilet.

While Richards was in the bathroom, Torres approached Klein and told him that no union steward was then available and requested that he accompany Richards to the meeting with Levester. Klein stated in his incident report that he agreed to this course, provided that Richards agreed to let Klein accompany him to the meeting. There is no evidence that the request for a union steward was passed along to Bradnan or Levester, and although Richards states that his request was denied, he does not identify the individual who issued the denial. Klein entered the bathroom and explained the situation to Richards, who declined to allow Klein accompany him because Klein was not actually a union steward.

Klein stated in his incident report that Levester came out of his office and Klein told him that Richards was sick in the bathroom. Levester testified that when he heard Richards had arrived at Willard he inquired as to Richards's whereabouts and was told Richards was in the

-4-

bathroom. Levester accepted this information and returned to his office.  Klein stated that Bradnan then entered the lobby and demanded to see Richards immediately, even after Klein had informed him that Richards was sick in the bathroom. Klein stated that Bradnan pounded his fists on the bathroom door and, using some profanity, instructed Richards to leave the bathroom. Richards testifies that Bradnan forcibly entered the bathroom and began to yell expletives at him and berate him, ordering Richards to get up and leave the bathroom. Richards testifies that he told Bradnan, through the locked bathroom door, that he was ill prior to Bradnan's entrance. Richards admits that he began to yell at Bradnan, allegedly in response to Bradnan's abuse. Richards does not remember if he also used expletives. Klein told investigators that Bradnan yelled, pounded on the bathroom door and used profanity and also that Richards crawled toward Bradnan while yelling in response to Bradnan's comments.

Bradnan, and Torres, present a different version of events. According to both men, Bradnan entered the lobby of the Willard building searching for Richards. Torres told Bradnan that Richards was in the bathroom. Bradnan went to the bathroom door, knocked, and called for Richards until he got an answer. He found the bathroom door unlocked, opened the door and looked inside. Richards was on his knees in front of the toilet. He asked if Richards was okay and Richards responded that he was sick.  Bradnan testified that he then propped open the door and tried to convince Richards to leave the public bathroom and use the more private administrative bathroom. Bradnan disclaimed any use of profanity. Torres and Bradnan both state that the major approached Torres to get his opinion regarding Richards's need for medical attention. Torres agreed that medical help was necessary and Bradnan contacted a medic. When Bradnan returned to the bathroom Richards was anxious and began to yell and scream. Bradnan states that

Richards was profane and that he approached Bradnan in a threatening manner with a pen or other object in his hands. Plaintiff contends that he did not have a pen and that Bradnan invented the allegation. Klein did not see a pen in Richards's hand.

William Pruyne ("Pruyne"), a medic at Willard-Cybulski, told investigators that he was called to the Willard building to attend to Richards. He stated that when he arrived Richards was on the floor in the bathroom, shaking and sweating and in extreme anxiety. According to Pruyne, Richards was yelling at other staff in an apparent effort to defend himself. Pruyne implies that he convinced Richards to leave with another corrections officer and go to a hospital for treatment.

Levester testified that his secretary came into his office and told him that there was a disturbance that required his attention. He went to the lobby and saw a large crowd gathered around the bathroom. He did not hear Bradnan yelling at Richards, but he did see Richards, on his knees and screaming at Bradnan. Levester stated that the medic was already present. Levester described Richards as "out of control" and testified that he was concerned that Richards was causing a serious disturbance that might become a safety hazard. The warden testified that he told Richards to "stop acting like a baby" and that this calmed Richards. According to Levester, he asked Richards what was wrong. Richards said he was sick and needed medical attention, and Levester responded that he would get an ambulance. Levester returned to his office and saw, through his window, Richards leave the Willard building with Klein. Levester stated that this surprised him and when he inquired as to why Richards had left, he was told that Richards had refused to wait for an ambulance.

According to plaintiff, Levester entered the bathroom and began to abuse Richards, calling him a "big baby" numerous times. Klein also stated that Levester called Richards a baby

-6-

multiple times. Klein reported that Levester instructed him to take Richards to a hospital and that Levester told Richards to leave work and not to return until further notice. Richards testified that Levester told him not to return to work until he had received a "doctor's note."

Klein took Richards to the hospital were he was treated and released. The cause, and nature, of his illness was not disclosed by either party and, apparently, remains unknown.

The Department of Corrections process for investigating employee complaints and other workplace incidents was not clarified by either party. According to Levester's testimony, he would write an incident report and send a packet of information to his superior officers and also to human resources. Someone in the Personnel Department would then decide if an investigation was necessary and choose an investigator. Typically, an investigation would be handled by someone at the facility where the incident occurred, but in some cases staff from the Security Division of the DOC would conduct the investigation. A member of the personnel staff, or the commissioner of corrections, makes all decisions regarding placement on administrative leave. The staff at the facility is not involved in issuing leave orders, although they typically inform the suspended officer of his placement on leave. All final disciplinary decisions are made by the commissioner of corrections, although the facility warden is given an opportunity to review the investigation report and also to comment on the proposed discipline.

Levester testified that he was notified that Richards was being placed on administrative leave and that he notified Richards of this fact. Richards was informed by letter, dated April 10, 2002, of his placement on administrative leave with pay. According to the letter, Richards was placed on leave to permit an investigation into the April 5th incident. Levester was not clear about the sequence of events surrounding the investigation into the April 5th incident, but it

appears that he initially ordered Major Bruce Cuscovitch ("Cuscovitch") to conduct the investigation internally. Levester was then notified by Clint White ("White"), a union steward, that Richards intended to seek an investigation into his and Bradnan's conduct on April 5th. Levester then sent a letter to his supervisor explaining the situation and requesting that Security Division conduct the investigation. Cuscovitch subsequently filed his own investigation report. Levester could not explain why Cuscovitch had conducted an internal investigation, except to surmise that human resources initially instructed him to conduct the investigation internally. Levester further states that he probably did not order Cuscovitch to stop after he realized that Richards's intention to complain about Levester and Bradnan made an internal investigation inappropriate.

The Security Division investigation was conducted by Captain S. Mendelson ("Mendelson"), with Captain Alberto Saavedro as a witness to some of the interviews. Mendelson's report concludes that Richards, while on his knees, approached Bradnan in the bathroom on April 5th, shouting and holding a pen, but this behavior could not have reasonably been interpreted as a threat of physical harm. Richards was not recommended for termination. A formal written reprimand was suggested as an appropriate discipline, in light of Richards's display of unprofessional behavior, along with separation of Richards and Bradnan by the permanent reassignment of Richards to a corrections facility other than Willard-Cybulski. The report also recommended that Levester and Bradnan receive counseling on alternatives to their actions on April 5th and on methods of behavior that would be more successful in de-escalating situations that occur on their watch. Both Levester and Bradnan testified that they never received such counseling nor were they informed of the report's recommendation.

Richards was placed on administrative leave for approximately six weeks, until May 15, 2002. Richards returned to Willard-Cybulski on May 22nd. Plaintiff notified Levester in writing, sometime shortly after he returned to work, that he felt threatened by Bradnan and requested that Bradnan be transferred to a different post. Levester testified that he spoke to White about Richards's complaints and that he requested Richards be moved to another facility to separate him from Bradnan. Cuscovitch's report, dated June 5, 2002, also included statements from Richards that he felt threatened, although Richards stated that Bradnan did not take any retaliatory action, physical or otherwise, against him after he returned to work. Levester testified that when he received Cuscovitch's report he realized that nothing had been done to separate Richards and Bradnan, so he notified the "central office" immediately that something should be done with Richards. Richards was notified by letter on June 13, 2002 that he was being temporarily reassigned to the Connecticut Correctional Institute– Enfield ("CCIE") pending the resolution of the investigation into the April 5th incident. Levester was transferred from Willard-Cybulski to the Hartford Correctional Center on July 1, 2002.

Richards was formally disciplined for his conduct on April 5th by means of a letter of reprimand issued on September 17, 2002. The letter was written by the new warden at Willard-Cybulski, Dennis Jones. According to the letter, Richards was disciplined for yelling profanities at Bradnan when the major was attempting to help Richards get from the public bathroom to an administrative bathroom in a more private area. Richards testified that he complained to a union representative about the reprimand but did not follow-up to ensure that a grievance was filed to protest the discipline. Further, Richards took no steps to claim employment discrimination before either the Connecticut Human Resources Commission or the Equal Employment Opportunity

Commission. Richards continues to work at CCIE with no changes to his rank, pay, status or job requirements.

The specific nature of Richards's complaint necessitates a brief review of three grievances filed by Richards in 1997, 1998 and 2002. Richards filed a grievance against defendant Captain Nelson Rodriguez ("Rodriguez") alleging that on July 20, 1998, Rodriguez approached Richards during the course of a routine inspection and twice brushed his hand across Richards's chest and down to the groin area. The grievance was filed on July 23, 1998. Rodriguez denied the charge and no witness could corroborate the events Richards described. During the course of an internal investigation Richards stated that Rodriguez might have been trying to brush dust from his uniform. The investigation concluded that Richards had recanted his accusation and found him to be in violation of an administrative directive requiring truthful cooperation with an investigation conducted by the DOC. No action was taken against either Richards or Rodriguez as a result of this incident.

The second grievance involved another allegation of sexual harassment. According to testimony provided to investigators by both Richards and the accused, Lieutenant Robert Hoffman, there was an incident between the two men on March 31, 1997. Hoffman approached Richards, who stood up rapidly from behind his desk and dropped a roll of toilet paper. Hoffman, presuming that Richards was hiding something, reached out and touched Richards's genitals. Richards notified Torres by letter on April 8, 1997 that the incident had occurred, and he was told to file an incident report. A meeting between Richards, Hoffman and two other men, including a union steward, was held on April 28, 1997. According to a report of the meeting that Hoffman filed with Torres, Richards stated that he did not want to further pursue his complaint against

Hoffman. Richards reported the incident to the Willard-Cybulski affirmative action officer, John

Presutti, on July 7, 1998. According to a report filed with the warden of Willard-Cybulski,

Sandra Sawicki, Richards told Presutti that he was suffering from depression and wanted a

formal apology and money from Hoffman. Presutti explained that Richards could no longer seek

redress through the Connecticut Human Resources Office or the Equal Employment Opportunity

Commission because the time for filing with either body had long expired. Richards requested

that Presutti notify the warden, and Presutti did so promptly. Richards also provided the court

with a copy of a letter, dated November 12, 1998 and addressed to "whom it may concern," in

which Richards alleged that the meeting with Hoffman was arranged by Warden Strange, who

wanted to keep the complaint of sexual harassment "in house." The context of this letter,

including its intended recipient, is not explained and there is no evidence that corroborates its

allegations.

Finally, Richards was involved in an incident with Murry on August 21, 2001. Murry

entered the control center looking for a flag and ordered Richards to search for the flag. Richards

did not find the flag, but Murry was able to locate it in a cabinet. Murry allegedly called Richards

stupid for being unable to find the flag. Richards claimed in his grievance that this insult led him

to have heart palpitations and stress which caused him to leave work to seek medical attention.

No evidence regarding any action resulting from this grievance has been presented to the court.

## **Standard of Review**

A motion for summary judgment may be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

## DISCUSSION

All five defendants in this action have moved for summary judgment on all three counts of the complaint. The First Count alleges a violation of 42 U.S.C. §1983 in the form of retaliatory employment discrimination intended to chill plaintiff's exercise of his first amendment rights. The Second Count claims violations of Richards's right to due process of law under the Fourteenth Amendment to the United States Constitution. The Third Count seeks damages for the intentional infliction of emotional distress. The federal claims will be considered

-12-

first, and if summary judgment is granted on both counts the court will exercise its discretion

pursuant to 28 U.S.C. §1369(c)(3) and dismiss the state law claims.

Richards's two federal claims are predicated on violations of §1983. A claim brought

pursuant to that section requires a showing that (1) the defendants deprived the plaintiff of a right

secured by the Constitution or the laws of the United States and (2) that the deprivation occurred

under the color of state law. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50

(1999). The statutory "color of law" requirement is identical to the state action requirement of the

Fourteenth Amendment. Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982).

### A. Sovereign Immunity

Richards's complaint names five defendants. Rodriguez, Levester, Bradnan and Murry

were sued in their individual and official capacities. The State of Connecticut Department of

Corrections also was named as a defendant. Plaintiff has offered no arguments explaining how

the DOC could be directly liable for damages, and no facts are presented that would support a

claim that the DOC is derivatively liable for the actions of the four individual defendants. The

complaint does not allege any liability for a failure to train, or a failure to supervise or for the

enactment of unconstitutional administrative regulations or policies. The only place the court can

find mention of the DOC as a defendant is in the title of the action, where the DOC is named as a

defendant. Against this background, the court will consider the defendants' argument that any

claims against the DOC, the state or the defendants in their official capacities are barred by the

doctrine of sovereign immunity.

"A suit generally may not be maintained directly against the State itself, or against an

agency or department of the State, unless the State has waived its sovereign immunity." Florida

-13-

Dept. Of State v. Treasure Salvors, Inc., 458 U.S. 670, 684 (1982). Suits seeking monetary damages may not be brought against the state or its agencies and departments, pursuant to §1983; rather, only suits for injunctive relief may be maintained against the state. Quern v. Jordan, 440 U.S. 332, 338 (1979). State officers acting in their official capacity may, typically, only be sued for injunctive or declaratory relief. Alden v. Maine, 527 U.S. 706, 757 (1999). An exception exists, however, where the unconstitutional or wrongful conduct is fairly attributable to the officer in his individual capacity and also where the damages will not be paid from the state treasury. Id.

Plaintiff offers no evidence and no arguments that might be construed as a claim for injunctive or declaratory relief. Further, Connecticut has not consented to this suit and Congress has not abrogated the state's sovereign immunity. Richards's suit is barred to the extent it seeks monetary damages from the DOC and, accordingly, the DOC is dismissed as a party to this case. The motion for summary judgment is granted as to all claims against the DOC.

Defendants also claim that sovereign immunity bars the suit against the four named individuals. The record does not support the defendants on this point. Richards has named the defendants in both their individual and official capacities. There are no claims for injunctive relief in the present action, and sovereign immunity does not bar Richards from bringing claims alleging constitutional violations against the defendants in their individual capacities. The motion for summary judgment based on sovereign immunity is denied as to the four individual defendants.

**B.  First Amendment Retaliation Claims**

Richards claims that he was harassed and retaliated against by all four individual

-14-

defendants in response to the filing of the two sexual harassment complaints against Hoffman and Rodriguez. A public employee retains the first amendment right to comment on matters of public interest even while employed by the government. Connick v. Myers, 461 U.S. 138, 140 (1983). A plaintiff, employed by the government, alleging a First Amendment retaliation claim must show that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action. Johnson v. Ganim, 342 F.3d 105, 112 (2003); Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 106-107 (2001). The plaintiff has failed, even with all facts and inferences taken in the light most favorable to his claim, to meet the governing legal standard.

At best, plaintiff has established that he filed sexual harassment claims against two officers wholly uninvolved in the events of April 5th, 2002. Those claims were filed, and the incidents underlying the filings occurred, approximately four and five years prior to the events giving rise to the present cause of action. Assuming, but not deciding, that plaintiff's statements do constitute speech on matters of public concern that are protected by the First Amendment, there is no showing of an adverse action taken by the defendants and also no proof, or basis for inferring, that the actions of the defendants were connected to the allegedly protected speech.

Richards claims that the adverse actions against him consist of: (1) his placement on administrative leave after filing his complaint against Bradnan; (2) the instigation of an investigation into a false allegation of workplace violence; (3) the written reprimand and transfer from Willard-Cybulski; and (4) the improper internal investigation conducted by Cuscovitch at Levester's request. Richards has failed to show that the defendants in any way caused any of

these actions to occur or that they constitute an adverse employment action against him.

As an initial matter, there is absolutely no evidence in the record that Levester had the authority to place Richards on administrative leave or that he made the decision on his own without instructions from other authority within the DOC. Richards points to no regulation, job description or testimony that might support an inference that Levester took action to suspend Richards. The only evidence in the record is from Levester's own testimony where he states that wardens do not have the power to place a corrections officer on administrative leave and that he was instructed to suspend Richards by persons outside the Willard-Cybulski facility. No amount of inferring the facts in Richards's favor can lead to the conclusion the Levester took a retaliatory act against the plaintiff by ordering his placement on administrative leave.

The initiation of a false action and investigation by Bradnan and Levester also lacks support in the record. Bradnan was not involved in compiling or submitting a report of the April 5th incident and there is absolutely no record that he had any authority to begin an investigation or to influence that decision. Similarly, the only evidence that relates to Levester's authority is Levester's own testimony that, once again, shows that Levester did not have the power to order an investigation independently of his own superiors. The letters and supporting materials supplied by Richards support Levester's claim that he asked his superiors to assign outside staff to conduct the formal investigation to ensure fairness to Richards.  The investigation conclusively determined that Richards did not threaten workplace violence and, accordingly, he was not disciplined for that action. There is neither evidence of an adverse impact on his employment nor evidence of actions taken by Levester and Bradnan that resulted in an adverse action.

-16-

The final two allegations of adverse employment action–the transfer away from Willard-Cybulski and the Cuscovitch investigation–may have been the result of actions taken by Levester, but there is absolutely nothing in the record that would implicate any of the other defendants in these actions. Only Levester could possibly have been involved in either decision, according to Richards's own evidence. Only one of the actions, however, can be termed adverse. The Cuscovitch investigation, though it may have been inappropriate, led to no actions against Richards. The report, at best, led to Levester's second recommendation that action be taken to separate Richards from Bradnan, but this request was made at Richards's behest, and it reflected Levester's concern regarding Richards's complaint that he felt threatened by Bradnan, a complaint that Levester obviously took seriously. The only possible adverse action against Richards as a result of Levester's actions was the transfer to CCIE. Plaintiff has failed to show that any defendant other than Levester has instigated any adverse employment action as required by Garcia.

Richards has also failed to show a causal connection between Levester, the adverse employment action and the allegedly protected speech. The evidence, drawn in plaintiff's favor, does not tie Levester to the decision to permanently transfer Richards to CCIE. The only motive for retaliation attributed to any of the defendants is a good working relationship between Bradnan and Rodriguez. There is no evidence that Rodriguez complained about Richards to Bradnan, that he encouraged Bradnan to investigate or attack Richards or that Rodriguez had ever, in nearly four years, taken any adverse action on his own against Richards. Indeed, plaintiff testified at his deposition that he had never suffered any retaliation as a result of the two sexual harassment grievances.

-17-

Absent any evidence of direct retaliation by the parties subject to the harassment grievances, it is not reasonable to conclude that Richards would suffer retaliation in the form of a false complaint arising out of an unusual confrontation between Bradnan and Richards. Bradnan could not have planned for the confrontation with Richards, and the confrontation itself lacks any direct punitive action against Richards. It is unlikely that the post-incident investigations, even if motivated by a desire to retaliate against Richards, were related to a four-year old grievance filed against persons not involved in the April 5th incident. There is nothing in the record that supports the inference of a causal connection that Richards asks the court to draw.

Regardless, the evidence of motive applies only to Bradnan, not to Levester and yet only Levester could possibly have taken the actions that Richards complains about in this case. There is no evidence that Levester had any relationship with Rodriguez or that he was even aware of the prior sexual harassment complaints. Levester was not posted to Willard-Cybulski at the time of the grievances nor was he posted at Willard-Cybulski when the final decision regarding Richards's transfer from the facility was made. Also, it is again notable that although Levester did recommend that Richards be separated from Bradnan–in response to Richards's own request–there is no evidence that he had any influence in the decision to transfer Richards instead of Bradnan or in the eventual decision to make the transfer permanent. As tenuous as the relationship between the alleged adverse action and Levester is, the tie between Levester and the stale harassment grievances is even more remote. The evidence simply does not sustain the causal connection.

The motion for summary judgment on the claim of retaliation in violation of the First Amendment is granted as to all four individual defendants. There is nothing in the record that

shows any actions by Murry, Rodriguez or Bradnan that led to or caused an adverse action

against Richards. Further, there is nothing that would support an inference that Levester was

acting in retaliation for the sexual harassment grievances. The record shows that the allegedly

protected speech was far removed in time from the alleged retaliation and there was no basis for

finding a relationship that might give rise to a motive for retaliation. Levester filed an incident

report as a direct response to the events of April 5, 2002, and while this report eventually led to

Richards's transfer from Willard-Cybulski, there is no reason to conclude that Levester had any

motive other than ensuring that the appropriate administrative steps were taken regarding the

April 5th incident.

### C. Fourteenth Amendment Claims

Richards's brief in opposition to the motion for summary judgment raises three claims

brought pursuant to the Fourteenth Amendment–violations of substantive due process,

procedural due process and equal protection. All three claims are brought against all defendants.

### 1. Equal Protection

The alleged equal protection claim was not raised in Richards's complaint and he has

made no move to amend his complaint to add a claim for violation of his right to equal protection

under the Fourteenth Amendment. A claim may be adjudicated on its merits, even where it has

not been pled, so long as considering the claim will not prejudice either party. Fed.R.Civ.P.

15(b). The decision to adjudicate the unpleaded claim is discretionary. See Cruz v. Coach Stores,

Inc., 202 F.3d 560, 569 (2d Cir. 2000). The court finds that review of the unpleaded equal

protection claim would be prejudicial to the defendants. The failure to properly plead the equal

protection violation has deprived defendants of the notice necessary to permit them to conduct

discovery and prepare a defense. The allegation of an equal protection violation in Richards's

opposition brief appears to be the first mention, explicit or implicit, of an equal protection

violation and there have been no arguments addressed to that issue in any other papers submitted

to the court. The defendants did not even seek summary judgment on the alleged equal protection

violation, presumably because they did not know it existed. Plaintiff has had more than two years

from the filing of this action to present the defendants and the court with some signal that he

intends to claim violation of his rights under the equal protection clause of the Fourteenth

Amendment. Richards's failure to provide this signal does not permit an adjudication on the

merits at this late stage in the proceedings. No claim for an equal protection violation is present

in the pleadings, and the court will not entertain any arguments on that subject.

### 2. Substantive Due Process

Richards bases his claimed violation of substantive due process not on any violation of a

fundamental right but rather on action by the defendants that rise to the level of subjective

deliberate indifference. Due process provides a protection of the individual against arbitrary

action of government. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998). The official

actions of an individual member of the government must be so egregious that they shock the

conscious in order to show a constitutional violation of substantive due process. Id. at 846. Mere

negligence is insufficient to shock the conscience; the plaintiff must show that the actor

"intended to injure in some way unjustifiable by any government interest." Id. at 849.[1] The

---

[1]Richards argues, implicitly, that the court should adopt the standard, established in
Farmer v. Brennan, 511 U.S. 825, 837 (1994), for finding deliberate indifference under the
Eighth Amendment. The Farmer court held that "a prison official cannot be found liable under
the Eighth Amendment for denying an inmate humane conditions of confinement unless the
official knows of and disregards an excessive risk to inmate health or safety; the official must

egregious conduct must go "beyond merely offending some fastidious squeamishness or private sentimentalism" so that it can fairly be viewed as brutal and offensive to human dignity. <u>Smith v. Half Hollow Hills Central School Dist.</u>, 298 F.3d 168, 173 (2d Cir. 2002).

Richards argues that the defendants' actions shock the conscience in three respects. First, he contends that Bradnan's conduct towards Richards while Richards was sick in the bathroom constituted a violation of substantive due process. Second, the alleged denial of medical treatment and union representation shocks the conscience. Finally, the alleged retaliation shocks the conscience.

The court has already held that the facts, taken in the light most favorable to Richards, fail to show retaliation in violation of his First Amendment rights. Therefore, there is no basis in any alleged retaliation for a finding that the actions of the defendants so shock the conscience as to result in a violation of substantive due process. The remaining claims also do not rise to the level of misdeed required to shock the conscience in a constitutional sense.

The Supreme Court has warned that judges should be reluctant to expand the concept of substantive due process because "guideposts for responsible decision-making in this uncharted area are scarce and open-ended." <u>Collins v. Harker Heights</u>, 503 U.S. 115, 125 (1992). This caution has led the courts to reject claims that "the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state law." <u>Id</u>. at 128.

---

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. The court will not apply this specialized standard to the substantive due process claim because the Supreme Court has not clearly adopted it for claims other than those brought under the Eighth Amendment. Assuming, arguendo, that this standard was adopted, it would not avail the plaintiff, as the facts are insufficient to show that any defendant was aware of any facts that Richards was faced with a substantial risk of serious harm as a result of the actions taken on April 5th.

The limits on expanding substantive due process apply especially to "claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship." Collins, 503 U.S. at 128. "The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." Bishop v. Wood, 426 U.S. 341, 350 (1976). "Where the plaintiff has not been physically abused, detained, prosecuted due to racial or political motivation or otherwise deprived of equal protection of the law, courts are reluctant to find conscience-shocking conduct that would implicate a constitutional violation." Hepburn v. City of Torrington, 2004 WL 1771590 *3 (D.Conn. Aug. 4, 2004)(quoting Torres v. Superintendent of Police of Puerto Rico, 893 F.2d 404, 410 (1st Cir. 1990)).

The facts alleged here, even with all inferences taken most favorably for Richards, cannot support a reasonable juror's conclusion that the defendants' conduct was a violation of substantive due process. The facts show that Richards was not denied medical treatment. He was treated at a nearby hospital and released. The plaintiff's insistence that he was denied treatment is plainly at odds with the facts. Assuming that Richards's intention is to seek compensation for the delay in his treatment there is still no basis for finding a constitutional violation. The record is devoid of any evidence or potential inference that Levester or Bradnan were aware of some serious harm that Richards might suffer as a result of a delay in receiving medical attention. The remaining individual defendants, Murry and Rodriguez, were again entirely absent from the decision-making process regarding the order for Richards to see Levester before receiving medical attention. There is nothing that suggests they denied him treatment of any kind. The actions must also be unjustifiable to shock the conscience, and that standard is not met here.

-22-

Levester testified that he wanted to verify that Richards was ill and ensure that replacement coverage for the prison was needed. It is hardly unconscionable for a supervisor to request a meeting with an employee before the employee leaves work sick, especially in a dangerous and difficult environment such as a prison where gaps in staffing present real hazards to other employees and inmates. The alleged denial of medical care does not rise to the level of a constitutional violation.

The claim that Richards was denied a union steward suffers from a similar infirmity. Richards never actually met with Levester on April 5th, as his condition was such that he was permitted to seek medical treatment without attending the proposed meeting. There is no evidence that either Levester or Bradnan was informed of Richards's desire for a union steward, nor is there any evidence that Torres's statement, provided by Richards, that no steward was available is either false or pretextual. At worst, the failure to make a union steward available falls into the category of the "numerous individual mistakes…inevitable in the day-to-day administration of our affairs" that the Supreme Court has held not to be matters of constitutional concern. Bishop, 426 U.S. at 350.

Bradnan's conduct, finally, may fairly be described as unprofessional and unnecessary. There is little doubt that his alleged aggression would contribute to the stress Richards was obviously experiencing. As unfortunate and distasteful as Bradanan's conduct might be, it simply does not shock the conscience and it certainly does not rise to the level of deliberate indifference. The constitution and the due process clause of the Fourteenth Amendment are not meant to be invoked whenever an administrative supervisor exhibits inappropriate behavior in the workplace. Plaintiff was not physically abused or otherwise subject to much more than a heated verbal

harangue from a supervisor that, the record shows, shared a contentious relationship with Richards. Bradnan's conduct simply does not meet the shock the conscience standard.

The record is devoid of evidence that proves, or permits an inference, that the conduct of the four individual defendants so shocks the conscience that a reasonable juror could find a violation of substantive due process under the Fourteenth Amendment. Summary judgment is granted as to all defendants on Count Two of the complaint.

### 2. Procedural Due Process

Richards's claim of procedural due process is predicated on the alleged denial by Levester and Bradnan of his request for a union steward. A plaintiff, in order to state a cause of action under the due process clause, must show that he has a property interest created by state law in the employment or the benefit that was removed. Bernheim v. Litt, 79 F.3d 318, 322 (2d Cir. 1996). The court can find no basis, and plaintiff cites no law, that would support a finding of a violation of the constitutional right to procedural due process where a corrections officer is not accompanied by a union steward for an informal meeting with a warden, especially where the meeting with the warden never occurred. Indeed, plaintiff fails to offer a single argument or precedent that supports his unstated contention that the right to a union steward is constitutionally protected. Assuming, without deciding, that the plaintiff's asserted right is constitutionally protected, there is still no evidence that Richards was denied procedural due process.

The record is clear that Richards never met with Levester on April 5th, except during the incident in the bathroom, and in the absence of a meeting there can hardly be deprivation of a constitutionally protected right, assuming that the right to a union steward rises to the level of a

-24-

constitutional protected interest. The presence of the union steward at the meeting with Levester presumes that a meeting with Levester occurred, something that is not apparent in the record. Further, the record is wholly devoid of evidence that Torres–the only person to whom Richards ever expressed a desire to have the company of a union steward–passed along the request to Levester or Bradnan. Indeed, although Richards claims that Levester and Bradnan denied his request, there is no evidence and no testimony from any party that Richards ever discussed the issue with either Levester or Bradnan. The claimed deprivation of right must actually occur before the plaintiff can seek recovery, and the alleged deprivation does not seem to have taken place, based on the facts presented.

The court notes, finally, that Richards does not raise any arguments in his opposition brief that either his placement on administrative leave without a hearing or his transfer from Willard-Cybulski was a violation of procedural due process, although his complaint insinuates that both events are part of his claimed constitutional violation. Again, no law is cited that would make either the right to work for the DOC without being subject to transfer or the right to a hearing prior to placement on leave a protected interest under state law. The lengthy process of impartial investigation prior to final disciplinary action–which here involved the written reprimand and the permanent transfer–clearly satisfies the due process requirements of Mathews v. Eldridge, 424 U.S. 319, 334-335 (1976). There are no discernable benefits to requiring an even lengthier and more complicated system of hearings and reports before a disciplinary action as minor as a written reprimand and a transfer of workplace–without any other punitive action or loss of employment benefit–is undertaken. Certainly, plaintiff offers no justification for more procedure. Similarly, if Richards was improperly denied his right to be attended by a union steward during

-25-

his meeting with Levester, the existing procedures for grieving a superior and requesting an investigation are more than adequate to provide any corrections officer with the necessary redress.[2] The record is devoid of any deprivations of procedural due process.

Finally, the court notes that, again, Richards fails to present any evidence that Murry or Rodriguez was in any way, shape or form involved in the alleged actions against him. Murry was never made aware of Richards's desire for a union steward and he was uninvolved in the decision to transfer Richards. Rodriguez was not involved in the April 5th incident in any fashion. Absent some showing that Levester, Bradnan, Rodriguez or Murry deprived Richards of a constitutionally protected interest without due process, there is no basis for a reasonable conclusion that Richards's constitutional rights were violated. Summary judgment is granted as to all four individual defendants.

## CONCLUSION

Summary judgment is granted to all defendants on Counts One and Two of the complaint. The state of Connecticut Department of Corrections is entitled to sovereign immunity and is immune from this lawsuit. The DOC is dismissed as a party and all claims against it are dismissed.

Further, Richards has failed to meet his burden of proof on either the claim of retaliation in violation of his First Amendment rights or the claimed denial of substantive and procedural

---

[2]Of course, if some more serious discipline had been taken against Richards–loss of pay or loss of employment–then the retroactive procedures for grieving a superior would not be sufficient and the rights ensured by Cleveland Bd. Of Ed. v. Loudermill, 470 U.S. 532 (1985) would be invoked. Richards does not allege any serious loss of employment benefits, other than the presence of a union steward and his subsequent transfer away from Willard-Cybulski.

due process. The evidence, taken in the light most favorable to Richards, is insufficient to support a reasonable juror's conclusion either that any of the four defendants retaliated against Richards or that any alleged retaliation was causally connected to his exercise of free speech rights. The record is also lacking in support for Richards's claim that any of the four defendants denied him either substantive or procedural due process of law. Summary judgment is granted to all four defendants on both counts.

Finally, the court, having dismissing all claims over which it had original jurisdiction, invokes its discretion pursuant to 28 U.S.C. §1367(c)(3) and dismisses the state law claim of intentional infliction of emotional distress without prejudice to Richards's refiling the claim in the appropriate forum.

The motion for summary judgment **[doc. #34]** is **GRANTED**.  Judgment shall enter in favor of the defendants on Counts One and Two of the complaint. Count Three is dismissed without prejudice. The Clerk of the Court shall close the case.


**IT IS SO ORDERED** at Hartford, Connecticut, this ___10th___ day of December, 2004.


_____/s/DJS_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**